**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------

**E.H.** *and* **K.H.** *on their own behalf,*
*and as parents and next friends of*
*C.H., a minor*,

                                        **Plaintiffs,**

                                                          **1:05-CV-972 (Lead)**
                        **v.**                            **1:06-CV-713 (Member)**
                                                                **(GLS)**

**BOARD OF EDUCATION OF THE**
**SHENENDEHOWA CENTRAL**
**SCHOOL DISTRICT;**
**SHENENDEHOWA CENTRAL**
**SCHOOL DISTRICT; KAREN**
**BOIKO; WILLIAM CASEY;**
**CHARLES HUFF; ERIKA RIEBEL;**
**DR. ROBERT MCCLURE,** *and*
**MICHAEL SMITH,**

                                        **Defendants.**


--------------------------------------------------------

**APPEARANCES:**                    **OF COUNSEL:**

**FOR THE PLAINTIFFS:**

Office of Mark B. Martin            MARK B. MARTIN, ESQ.
One N. Charles Street
Suite 1215
Baltimore, MD 21201

**FOR THE DEFENDANTS:**

Bartlett, Pontiff Law Firm                    EILEEN M. HAYNES, ESQ.
P.O. Box 2168
One Washington Street
Glens Falls, NY 12801-2168

**Gary L. Sharpe**
**U.S. District Judge**

## DECISION AND ORDER

### I. Introduction

Plaintiffs EH and KH commenced these consolidated actions pursuant

to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et

seq.; § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the Americans

with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; and 42 U.S.C. § 1983

for violations of § 504 and the ADA, claiming that defendants failed to provide

their son CH with an appropriate public education and discriminated against

him based on his disability.  The plaintiffs move for summary judgment on the

IDEA claim, and the defendants move for summary judgment on all claims.

For the reasons that follow defendants' motion is granted.

### II. FACTS

**A.     05-CV-972**

### 1. **Summer 2001**

CH is a child with a disability under the IDEA.  (Pl. SMF ¶ 2, Dkt. No. 65:6.)  EH and KH are his adoptive parents.  *Id.* at ¶ 1.  In April of 2001, when CH was five, he was diagnosed with Pervasive Developmental Disorder ("PDD") which is on the autistic spectrum.  *Id.* at ¶ 12.  He exhibited symptoms including hand flapping, difficulty expressing his needs, echolalia,[1] a dislike of loud noises and being touched, and impaired social skills.  *Id.* at ¶¶ 13, 14.

KH referred CH to the Shenendehowa Committee on Special Education ("CSE") in April 2001.  *Id.* at ¶¶ 16, 17.  Throughout May and June, various evaluations of CH confirmed his PDD diagnosis and noted that he was still wearing diapers, exhibited self stimulatory behaviors, and had delays in fine motor skills and sensory integration difficulties.  *Id.* at ¶¶ 18, 22, 23, 24. Summer services were recommended, including coping skills, speech and language services, occupational therapy ("OT"), cooperative social interactions, and an assessment prior to confirming a 2001-02 placement.  *Id.*

Subsequently, the CSE met on July 18th to develop an Individualized Education Program ("IEP") for the Summer.  *Id.* at ¶¶ 25-27.  The CSE

---

[1]Echolalia is the repetition of certain phrases or statements.

identified CH as other health impaired based on his PDD diagnosis.  *Id.*  An

IEP was developed that provided for academic instruction, speech and

language therapy,  OT, and recommended a placement at Arongen

Elementary School.  *Id.* at ¶¶ 25-28.  KH gave her consent to the placement

recommended by the CSE.  *Id.* at ¶ 28.  The parents contend that the School

District (the "District" or "Shen") subsequently refused to provide summer

services due to a staff shortage, which the District denies.  *Id.* at ¶¶ 28-31.

### 2. 2001-02 School Year

A CSE meeting was held on August 30, 2001 to develop CH's IEP for

the 2001-02 school year.  *Id.* At ¶ 32.  KH alleges that she was not allowed to

discuss documents regarding proposed goals and parental concerns she had

brought to the meeting, which is again contested.  *Id.* at ¶¶ 32, 33.  The 2001-

02 IEP placed CH in an out of district 12:1:4[2] BOCES placement known as

BOCES BEARS.  Among the services provided for were a one on one

teaching aide, individual speech language therapy, individual and group OT

and physical therapy and speech evaluations in the Fall of 2001.  *Id.* at ¶¶ 34,

35.  CH attended this placement for only five days before it became clear that

he functioned at a higher level than the other children and he was removed.

───────────────────

[2]This indicates 12 students, 1 teacher and 4 aides.

4

(Def. SMF ¶ 3, Dkt. No. 58:14.)

Accordingly, the CSE reconvened on October 1st and developed an IEP which placed CH in a mainstream Kindergarten classroom for the morning and a 12:1:1 self contained language concepts classroom for the afternoon. *Id.* at ¶ 3.  The parents again claim they were denied participation in this process.  (Pl. SMF ¶ 39, Dkt. No. 65:6.)  The IEP noted that CH's primary areas of concern were in social interactions and social language skills. *Id.*  It provided for a shared aide, slightly reduced individual and group OT and speech language therapy services, and an OT sensory diet consult.[3]  *Id.* at ¶¶ 40-45.  The physical therapy and speech evaluation provided for in the August IEP were also removed. *Id.* At ¶¶ 41-42.  On October 18, 2001, the District referred CH to Karner Intensive Development Services ("KIDS") because of difficulties transitioning CH to school, but no functional behavioral assessment ("FBA"), behavioral intervention plan ("BIP"), or transition plan was recommended by the CSE.[4]  *Id.* at ¶ 48.  KH undertook the responsibility of transporting CH to school, as she was dissatisfied with the special

---

[3]A sensory diet is a personalized activity schedule that plans and controls the sensory stimulus a child will be exposed to throughout the day.

[4]A FBA is a process by which a student's problematic behaviors are observed to determine why the student is engaging in such behavior.  A BIP is a concrete plan that is then developed to deal with deal with the problematic behavior.

transportation provided by the District.  *Id.* At ¶ 52.

While teacher notes indicate CH made progress and mastered some OT objectives under the October IEP, he apparently had problems transitioning to school due to anxiety and he allegedly began exhibiting behavioral problems.  *Id.* At ¶ 49.  By the end of the 2001-02 school year, CH was not attending his morning placement and was, on average, attending his afternoon 12:1:1 placement 3 days a week.  *Id.* At ¶ 56.

### 3. Summer 2002

Throughout May and June of 2002, the District and CH's parents had a number of evaluations completed for CH.  *Id.* at ¶ 63.  A school psychologist and KIDS indicated that generally CH had successfully transitioned to school.  *Id.* At ¶¶ 63-64.  A private psychiatrist, Dr. Atkin, recommended, *inter alia*, a smaller placement for CH for the summer and 2002-03 school year, a non-punitive teacher knowledgeable in PDD and a social skills class.  *Id.* at ¶ 68.  KIDS recommended, *inter alia*, a very structured classroom for 2002-03, a behavioral specialist, a behavioral plan for toilet training and transitioning to school, a plan to deal with sensory issues and anxiety and visual schedules.  *Id.* At ¶ 69.

For the summer, Shen offered CH a 10:1:2 placement with OT services

twice a week.  CH's parents rejected this as inappropriate and he received no services from Shen during the summer.  *Id.* at ¶¶ 59, 61.  Instead, his parents paid for him to have OT services three times a week from an independent provider during the summer.  *Id.* At ¶ 67.  CH would not attend school again.

### 4. 2002-03 School Year

On August 16, 2002, the CSE met to develop CH's IEP for the 2002-03 school year and changed his classification to autism.  *Id.* at ¶ 70.  The August IEP placed CH in a regular education first grade classroom, with an hour a day in a 12:1:2 classroom.  *Id.* at ¶ 70.  It provided for either a shared or one-on-one aide,[5] 30 minutes of individual OT services twice a week, a 30 minute OT consult once a week and 30 minutes of group counseling once a week. The areas of counseling included behavior therapy, social skills, FBA and BIP.  *Id.* at ¶ 71.  Some of the previously mentioned recommendations of KIDS and Dr. Atkin were not included in the IEP.  *Id.* at ¶ 76, 77.

The parents did not agree to this IEP and indicated to the CSE that they felt they had been denied participation in its formulation. Id. at ¶¶ 79, 80.  As such, another CSE meeting was scheduled for September 5th. (Def. SMF ¶ 10, Dkt. No. 58:14.)  The parents subsequently cancelled this meeting,

_____

[5]The IEP is internally inconsistent as to the nature of the aide.

indicated to the District that they had decided to home school CH and requested that his IEP services be pushed into the home.  *Id.*  Despite multiple requests, they failed to submit an Individualized Home Instruction Plan, necessary for the District to approve home schooling.  *Id.* at ¶ 83.

In September, CH was evaluated at public expense by neuropsychologist, Dr. Zuffante.  *Id.* at ¶ 86.  Testing revealed generally average academic abilities with weakness in nonverbal and executive functioning and anxiety in unpredictable social settings.  (Def. SMF ¶¶ 11, 12, Dkt. No. 58:14.)  A small placement was recommended with fewer transitions and specific behavioral and sensory therapies.  *Id.*  An independent speech language pathologist recommended speech therapy in a small group and a one-on-one aide, among other services.   (Pl. SMF ¶ 87, Dkt. No. 65:6.)  In a brief letter, CH's pediatrician, Dr. Buckley, recommended that the District should provide a special education teacher trained in the area of autism, OT, speech and language therapy and physical therapy in the home.  *Id.* at ¶ 84.

Upon request for such services in the home, the District indicated it would provide a weekly sensory diet consult and OT twice a week for 30 minutes, as stated in the August 16, 2002 IEP, until they were provided the relevant evaluations.  *Id.* at ¶ 90.  CH received such OT services for a short

8

time at the beginning of the 2002-2003 school year.  *Id.* at ¶ 92.  However, CH's parents postponed the services due to a dispute about the lack of OT goals in his IEP.  *Id.* at ¶ 92.  These services were not renewed as no agreement was reached.  *Id.* at ¶ 94.

### 5. 2003-04 School Year

On June 18, 2003, Dr. Atkin wrote to the CSE informing it that CH had asperger's syndrome, ADHD and anxiety disorder.  *Id.* at ¶ 102.  She recommended a 6:1:2 class for high functioning PDD students and various services.  *Id.*  On June 24th a CSE meeting was held to discuss CH's IEP for 2003-004, which ended without consensus.  *Id.* at ¶ 97.  On July 14th, Dr. Buckley recommended that CH be placed in a six child classroom with 45 minutes of OT three times a week and 30 minutes of speech and language therapy three times a week.  *Id.* at ¶ 101.  On August 4th, the parents wrote to the District indicating interest in a 6:1:2 placement, and requesting specific home services.  *Id.* at ¶¶ 103, 104.  In response, the CSE wrote to the parents indicating that they had rejected numerous in and out of district placements discussed at the June 24th meeting, some of which were 6:1:2 classrooms.  *Id.*

A CSE meeting was held on August 13th to again attempt development

of CH's IEP for the 2003-04 school year.  *Id.* at ¶ 105.  It was recommended that home instruction continue until September 30th, while the parents observed four classrooms with the school psychologist in the interim.  (Def. SMF ¶ 17, Dkt. No. 58:14.)  An interim home placement IEP was developed which provided for the following home services: three one hour OT sessions every two weeks, three one hour speech language therapy sessions every two weeks, and three behavioral intervention consultations a month.  (Pl. SMF ¶ 105, Dkt. No. 65:6.)  A CSE meeting was scheduled for October 2nd.  (D1 Ex. 90.)[6]  On August 15th, the District approved the services of Dr. Cosgrove, a behavioral psychologist, for the behavioral intervention consult.  (D1 Ex. 91.)

On August 20th, the parents objected to the CSE's proposed placements and indicated their belief that the CSE had already rejected some of the placements as inappropriate.  (Pl. SMF ¶ 108, Dkt. No. 65:6.)  On August 22nd, the parents discontinued the behavioral intervention consult because they felt the school had misled Dr. Cosgrove about CH's needs.  (Def. SMF ¶ 18, Dkt. No. 58:14.)  On August 28th, the parents indicated they would not attend the October 2nd CSE meeting.  (D1 Ex. 98.)  They also

---

[6]References to D1, P1 and Tr1 are to defendants' exhibits, plaintiffs' exhibits and the transcript in the first administrative hearing, respectively.  References to evidence from the second administrative hearing are made in the same manner; D2, P2, Tr2.

informed the CSE that they were denying the occupational therapist and speech and language therapist access to CH due to inappropriate and missing goals and objectives in the August IEP.  (Def. SMF ¶ 19, Dkt. No. 58:14.)  In September, the parents filed a complaint with the NY Office of Vocational and Educational Services for Individuals with Disabilities ("VESID") alleging violations of the IDEA during the 2001-02 and 2002-03 school years. *Id.*

A CSE meeting was rescheduled for October 22nd, when a 2003-04 IEP was developed which provided for a 12:1:3 classroom.  *Id.* at ¶ 21.  Services included five 30 minute OT sessions every two weeks, five 30 minute speech/language therapy sessions every two weeks, and three behavioral intervention consultations a month to help CH transition to school.  *Id.*  The IEP also provided program modifications including preferential seating, a sensory diet, extended time to complete tasks and simplified directions, transitions, activities, and assignments.  *Id.*  The parents rejected this IEP.  On October 24th, CH was evaluated using WIAT-II testing, which revealed average reading skills and low average spelling and math skills.  *Id.* at ¶ 22.

On December 1, 2003, VESID found that CH's IEP lacked specific measurable annual goals, but rejected or declined to address the remainder

of the parents' objections. *Id.* At ¶ 23.  The CSE was required to reconvene

and submit measurable annual goals to VESID for the 2003-04 school year

by January 10, 2004, which it did. *Id.* At ¶ 24.  On January 19th, the parents

terminated the home speech/language therapist provided by the school

because they found her behavior towards CH "inappropriate."  *Id.*  The District

was unable to find another therapist due to staff shortages at various

independent providers.  *Id.* at ¶ 26.  On February 6th, the CSE met again to

revise CH's IEP, which remained essentially the same as the October 22nd

IEP except for increases in the duration of OT and speech/language

sessions.  *Id.* at ¶ 25.

### 6.  <u>First Due Process Hearing</u>

On May 10, 2004, the parents requested a due process hearing arising

out of the District's alleged failure to provide CH a free, appropriate public

education ("FAPE") for the 2001-02, 2002-03 and 2003-04 school years.  *Id.*

at ¶ 27.  In a decision dated November 15, 2004, Independent Hearing Officer

("IHO") Freed found, *inter alia*, that the parents' challenges to the 2001-02 and

2002-03 IEPs were barred by laches and that the 2003-04 IEP provided a

FAPE.  *Id.* at ¶ 28.  The parents appealed to the Office of State Review.  *Id.*

State Review Officer ("SRO") Kelly, in essence, affirmed the decision of IHO

Freed, finding that the parents challenges to the 2001-02 and 2002-03 IEPs were barred under a one year statute of limitations and that the 2003-04 IEP provided CH with a FAPE. *Id.* On August 3, 2005, the parents appealed SRO Kelly's decision to this court. *Id.*

**B.   06-CV-713**

### 1. 2004-05 School Year

On August 3, 2004, CH's parents submitted two letters to the CSE from Dr. Daly, a psychiatrist, recommending that CH be placed in a small supportive environment with minimal stimuli. *Id.* at ¶ 31. The CSE was also provided recommendations from CH's OT provider who recommended a one-on-one aide, a class of less than 10 children with needs similar to CH's and a quiet place for him to go when overwhelmed. *Id.*

On August 9th, the CSE met to draft CH's IEP for 2004-05, agreed to develop a BIP and transition plan, and then tabled the meeting in anticipation of an independent educational evaluation ("IEE") from CH's neuropsychologist , Dr. Curley. *Id.* at ¶ 31. It also agreed to allow the parents to work with the Speech and OT therapists on updating CH's performance levels. *Id.*

On August 19th, the CSE reconvened and created a 2004-05 IEP which

provided for a 12:1:2, 3rd grade placement, and continued to classify CH as a child with autism.  *Id.* at ¶ 33.  The following services were provided for: a one-on-one aide;  three one-hour long individual OT sessions a week; an OT consultation for 30 minutes once a week; five one-hour long individual speech/language therapy sessions every two weeks; a behavior intervention consultation 3 times per month; and supplemental services including preferential seating, a sensory diet, simplified directions, activities, and assignments and use of assistive technology devices.  *Id.*  The IEP provided for measurable goals and objectives in math, reading, writing, speech/language, motor/occupational therapy and daily living skills.  *Id.*  It further described CH's needs and abilities in great detail.  *Id.*

Services were to be provided at home until CH was successfully transitioned back to school. *Id.*  Until such time, the IEP also provided for home teacher consultant services for two hours a week.  *Id.*  While CH's parents approved of aspects of this IEP, they ultimately disagreed with it and the 12:1:2 placement.  *Id.* at ¶ 34.  However, they acquiesced to behavioral consultations to develop a FBA, BIP and transition plan.  *Id.*  They also agreed to the provision of OT, speech and consultant teacher services in the home.  *Id.*

Beginning in September of 2004, the District provided individual OT 3 times a week for an hour and individual speech therapy 5 times every two weeks for an hour at CH's home.  *Id.* at ¶ 35.  A home teacher was also provided for 2 hours per week starting in September.  *Id.*  However, the parents were unhappy with the quality and frequency of the home instruction, allegedly cancelled many of the sessions, and requested a different teacher and daily home instruction on multiple occasions.  (D2 Ex. 24, 35.)

Though the behavioral consultant was supposed to meet with CH three times a month to develop an FBA, BIP and transition plan, he or his colleague met with CH only once on September 13, 2004 and then three times between November 9th and December 22nd.  (Def. SMF ¶ 36, Dkt. No. 58:14.)  On November 16, 2004, the parents provided the CSE with a copy of Dr. Curley's IEE.  *Id.* at ¶ 38.  The evaluation indicated that CH was improving in some areas, such as reading, and had generally unchanged academic achievement.  *Id.*  The evaluation further found no signs of anxiety.  *Id.*  However, it indicated that he was not making expected gains in spelling and math and was weak in socialization, executive functioning, communication and daily living skills.  *Id.*  The evaluation ultimately diagnosed CH with high functioning autism.  *Id.* at ¶ 33.  Recommendations were made, one of which

15

was that CH be placed in a small (6:1:1) structured classroom with other children with high functioning autism, or, if no such placement existed, that he be home schooled.  *Id.*

On December 14, 2004, the CSE reconvened to review Dr. Curley's IEE and check the development of the FBA.  *Id.* at ¶ 39.  While many of Dr. Curley's recommendations had already been incorporated into the August IEP, the CSE did increase CH's speech language services.  *Id.* at ¶ 38.   The behavioral consultants initial FBA was also completed on this date.  (P2 Ex. W.)

On December 16th and 17th, various school officials and service providers met with the behavioral consultants to discuss CH's behavioral and transition plan.  (Def. SMF ¶ 39, Dkt. No. 58:14.)  Subsequently, on or about January 4th, 2005, school officials met with CH's parents to review the first draft of the FBA.  *Id.*  The next day the parents informed the school that they were rejecting the FBA and requested that an independent behavior consultant complete a new FBA.  *Id.*  On January 8th, they rejected the 2004-2005 IEP and requested a second administrative due process hearing.  *Id.* On January 12, 2005, the CSE met to work on revising the goals and objectives in the December 2004 IEP.  *Id.* at ¶ 40.  The parents could not

attend this meeting.  *Id.*  An attempt to hold a CSE meeting on January 19th

was again unsuccessful because the parents were unable to attend.  *Id.*

Eventually, a meeting was held between the parents, the behavioral

consultant and CH's service providers to discuss problems with the FBA.  A

revised FBA was completed on January 28, 2005.  *Id.*

On February 2, 2005, the CSE again met to review CH's goals and

objectives and finalize the IEP.  *Id.* at ¶ 41. CH's IEP was revised to include a

deadline for termination of all home services; new reading, writing and math

goals and objectives; and a new section on social and emotional behavior

with corresponding goals and objectives.  *Id.*  CH's parents rejected this

revised IEP on February 21, 2005.  *Id.* On February 24, 2005 a final FBA was

submitted to the CSE by the Behavioral Consultant.  (Pl. SMF ¶ 150,Dkt. No.

65:6)

## 2.  Second Due Process Hearing

On March 15, 2005, IHO Turetsky found that CH's pendency

placement was in the home, with the District providing OT 3 times a week for

an hour, speech/language therapy 3 times a week for an hour and a home

teacher consult for two hours a week.  *Id.* at ¶ 154. On October 31, 2005, IHO

Turetsky found that the 2004-2005 IEP provided a FAPE.  *Id.* at ¶ 156.  He

granted the parents request for an independent FBA and ordered the District

to develop a BIP and transition plan for CH's transition back to school within

30 days of receipt of the FBA.  Id. at ¶ 157.  The parents appealed this

decision.  *Id.* at ¶ 159.  SRO Joseph Frey determined that the 2004-05 IEP

was reasonably calculated to provide CH with a FAPE and that there was no

need for the development of an independent FBA.  (Def. SMF ¶ 43, Dkt. No.

58:14.)  However, he found that the District's delay in conducting the FBA and

developing a transition plan amounted to the denial of a FAPE in that it unduly

extended CH's temporary home placement, thus preventing him from the

benefit of the IEP which was developed.  *Id.*  The case was accordingly

remanded to the CSE for, *inter alia*, a determination of the necessity of

additional compensatory services and to develop a transition plan.  *Id.*  The

parents subsequently appealed the decision to this court as 06-CV-713.  Id. at

¶ 44.

## III. <u>DISCUSSION</u>

## A.   <u>IDEA Actions</u>

### 1. <u>Standard of Review</u>

The IDEA was enacted to ensure that disabled children are provided a

FAPE.  *See Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363 (2d Cir.

2006).  "A free appropriate public education 'must include special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits.'"  *Id.* (citation omitted).  It is important to note, however, that in providing an appropriate education, schools are not required to maximize a student's potential.  *Bd. of Educ. v. Rowley*, 458 U.S. 176, 197 n.21 (1982).

The creation of an IEP for each disabled student is central to the scheme set forth in the IDEA and New York's regulations under the Act.  *Id.* An IEP must be "reasonably calculated to enable the child to receive educational benefits," which is to say it must be "likely to produce progress, not regression."  *D.F. v. Ramapo Cent. Sch. Dist.*, 430 F.3d 595, 598 (2d Cir. 2005).  If the guardian of the disabled child is unhappy with the IEP that has been developed, he or she may demand an impartial hearing before an impartial hearing officer, who makes a determination as to the appropriateness of the IEP.  N.Y. EDUC. LAW § 4404(1)(a) (McKinney 2007). A further appeal is available to a SRO under § 4404(2).  A New York Supreme Court or U.S. District Court may then review the decision of the SRO.  20 U.S.C. § 1415(i)(2)(B)

When a party moves for summary judgment in an IDEA action, the

normal inquiry as to whether there are any disputed material facts does not apply.  *See New Paltz Cent. Sch. Dist. v. St. Pierre*, 307 F. Supp. 2d 394, 397 (N.D.N.Y. 2004).  Instead the inquiry is "whether the administrative record, together with any additional evidence, establishes that there has been compliance with [the] IDEA."  *Id.*  "The district court must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence.'" *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (internal citation omitted).

To help guide courts in this review the Supreme Court has set out a two part test.  "First, has the State complied with the procedures set forth in the Act?  And second, is the [IEP] developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Rowley*, 458 U.S. at 206.  For an IEP to be set aside on procedural grounds, there must be some evidence that procedural defects compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits. See 20 U.S.C. § 1415(f)(3)(E)(ii), *Winkelman v. Parma City Sch. Dist.,* 127 S. Ct. 1994, 2001 (2007).  The burden of proof in IDEA actions lies with the party challenging the IEP.  See *Schaffer v. Weast*,

546 U.S. 49, 62 (2005).

While engaging in this analysis, it is important to recognize that "courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Rowley,* 458 U.S. at 208. Thus, the Supreme Court has warned that judicial review of administrative decisions under the IDEA "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* at 206. "IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy." *Cerra v. Pawling Cent. School Dist.,* 427 F.3d 186, 191 (2d Cir. 2005). Accordingly, "[f]or a federal court to conduct an 'independent' review of a challenged IEP without 'impermissibly meddling in state educational methodology,' it must examine the record for any 'objective evidence' indicating whether the child is likely to make progress or regress under the proposed plan." *Walczak v. Fl. Union Free Sch. Dist.,* 142 F.3d 119, 130 (2d Cir. 1998) (citations omitted).

### 2. Challenges to 2001-02, 2002-03 Years; Statute of Limitations

Plaintiffs initially contend that IHO Freed and SRO Kelly erred in finding their challenges to the 2001-02 and 2002-03 school years time barred.

Prior to 2005, the IDEA and its implementing regulations did not contain a statute of limitations.[7]  As such, the Second Circuit directed that the "most appropriate or analogous state statute of limitations," be applied to IDEA actions, running from the date the plaintiff knew or should have known of his injury.  *See M.D. v. Southington Bd. of Educ.*, 334 F.3d 217, 221-22 (2d Cir. 2003) (quoting *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660 (1987)); *Singleton v. City of N.Y.*, 632 F.2d 185, 191 (2d. Cir. 1980).  Under this directive, SRO Kelly's decisions regularly found the New York Human Rights Law ("NYHRL") most analogous to the IDEA.  Therefore he applied the one year statute of limitations found in § 297(5) of the NYHRL to administrative requests for due process hearings under the IDEA. *See, e.g., Application of a Child with a Disability*, Appeal No. 04-082; *Application of the Bd. of Educ. of the Wappingers Cent. Sch. Dist.*, Appeal No. 02-119.  Accordingly, in the present instance, SRO Kelly found plaintiffs' challenge to CH's 2001-02 and 2002-03 IEPs time barred because a due process hearing was not requested until May of 2004.  *See Application of a Child with a Disability*, Appeal No. 04-

---

[7]The IDEA now provides that "a parent shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint."  20 U.S.C. § 1415(f)(3)(C).  An appeal from a final decision of the agency must be brought in district court within "90 days from the date of the decision of the hearing officer."  20 U.S.C. § 1415(i)(2)(B).

110 at 10.

Plaintiffs argue that this was error, and contend that a three year statute of limitations should be applied to their challenges to these school years. However, the cases plaintiffs cite in support of this argument do not deal with the appropriate time period for requesting an administrative due process hearing, as is the issue here.  Rather, with one exception, such cases deal with the applicable statute of limitations for the filing of a civil action under the IDEA.  *See, e.g., Green v. City of New York,* 438 F. Supp. 2d 111, 124-25 (E.D.N.Y. 2006) (finding IDEA claim filed in court time barred under 3 year SOL when it accrued in 2000 and complaint was filed in 2005); *Butler v. South Glens Falls Cent. Sch. Dist.,* 106 F. Supp. 2d 414, 418-19 (N.D.N.Y. 2000) (discussing various time periods within which to file IDEA action in court).  The exception, *Somoza v. N.Y. City Dept. of Educ.*, 475 F. Supp. 2d 373 (S.D.N.Y. 2007), did contemplate the application of a three year statute of limitations, among others, to a plaintiff's request for an administrative due process hearing.  *Id.* at 384.  However, the court ultimately skirted the issue by finding the plaintiff's administrative request timely under all potential time periods.  *Id.* at 387.  Thus, *Somoza* is inappropriate precedent to rely on for plaintiffs' argument that a three year statute of limitations is applicable to a

request for a due process hearing.

Additionally, the cases plaintiffs cite apply a three year statute of limitations to the filing of an action only where the plaintiff either failed to exhaust his administrative remedies because he was not informed of his due process rights, or was not strictly appealing from an administrative decision. *See, e.g., Brooklyn Sch. for Special Children v. Crew*, No. 96 Civ. 5014, 1997 WL 539775, at *12 (S.D.N.Y. Aug. 28, 1997) (class action by schools for reimbursement from the State under the IDEA); *Robert D. v. Sobel*, 688 F. Supp. 861, 864 (S.D.N.Y. 1988) (action for attorney's fees incurred in IDEA administrative hearing).  *See also Mason v. Schenectady City Sch. Dist.*, 879 F. Supp. 215, 218-20 (N.D.N.Y. 1993) (IDEA action where failure of district to advise plaintiffs of due process rights led to their failure to exhaust administrative remedies).  Such is clearly not the case in the present instance.

Here, plaintiffs were informed as to how to assert their due process rights multiple times as early July 18, 2001.  (*See, e.g.*, D1 Exs. 9; 15; 16; 20; 22; 27; 30; 34; 35.)  They had objections to the relevant IEPs no later than August 16, 2002, and informed the District that they were home schooling their son for the 2002-03 school year on September 5, 2002.  (D1 Ex. 61; 66.)

Yet they failed to request an administrative due process hearing until May 10, 2004.  (D1 Ex. 134.)  Accordingly, the SRO properly applied a one year statute of limitations and found the plaintiffs' challenges to the 2001-02 and 2002-03 IEPs timed barred.[8]

### 3.  <u>Challenges to the 2003-04 and 2004-05 School Years</u>[9]

Plaintiffs make four arguments in alleging that CH was denied a FAPE for the 2003-04 and 2004-05 school years: a) that the District failed to provide a final IEP for 2003-04 prior to the beginning of the school year in violation of 34 C.F.R. § 300.342(a); b) that the 2003-04 IEP lacked appropriate annual goals; c) that the 2003-04 and 2004-05 IEPs were all fatally defective in that they failed to provide for, or timely implement, an FBA, BIP or transition plan for CH; and d) that the District's failure to place CH in a six or eight child

---

[8]While an argument could be made that the NYHRL's one year statute of limitations was not the most appropriate or analogous time period to apply to administrative due process requests under the IDEA, no briefing has been presented on this score, except as addressed above.  As such, the court notes only that it adopts the reasoning set forth in *Application of the Bd. of Educ. of the Wappingers Cent. Sch. Dist.*, Appeal No. 02-119, in finding that SRO Kelly properly applied such a one year statute of limitations as the most appropriate and analogous time period here.

[9]Plaintiffs' 2006 complaint also contains a paragraph which contends that the District denied CH a FAPE during the 2005-06 school year.  However, they have presented no facts or argument for that school year in connection with the current motions.  Nor have plaintiffs opposed the argument that they have failed to exhaust their administrative remedies as to that year.  *See Polera v. Bd. of Educ.*, 288 F.3d 478, 487 (2d Cir. 2002).  As such, the court deems the plaintiffs to have conceded that claims arising out of the 2005-06 school year are barred, and to have accordingly abandoned them.

classroom for the 2003-04 and 2004-05 school years deprived him of meaningful educational benefit.  The court addresses each of these arguments in turn.

### a) Failure to Provide a Final IEP at the Start of the 2003-04 School Year

The court first addresses plaintiffs' passing contention that the District's failure to have a final IEP with a recommended classroom placement for CH by the start of the 2003-04 school year was a "significant and fatal error." (See Dkt. No. 66 at 21-22.)  This argument arises out of the fact that CH only had a temporary home placement IEP in place from August 13[nd] until October 22nd, when the CSE created a "final" IEP placing CH in a 12:1:3 classroom. (D1 Exs. 89; 105)

During the relevant period, 34 C.F.R. § 300.342(a), now recodified at § 300.323(a), provided that "[a]t the beginning of each school year, each [school district] shall have an IEP in effect for each child with a disability within its jurisdiction."  However, the court does not believe that this regulation required that the District necessarily have a "final" IEP in place by the beginning of the school year, contrary to plaintiffs' contention.  At the time, the official commentary to the IDEA regulations explicitly recognized the use of interim placements and IEPs in contemplation of the creation of a final

placement and IEP.  *See* 34 C.F.R. Part 300, Appendix A, Notice of

Interpretation, Section IV, Question 14 (2004).  *See also D.D. v. N.Y. City Bd.*

*of Educ.*, 465 F.3d 503, 514 (2d Cir. 2006) (finding that delay in the

implementation of a final IEP may be acceptable under certain

circumstances).  Accordingly, in the court's view, § 300.342(a) was not

violated *per se* so long as the District had a proper IEP, temporary or final, in

place for CH at the beginning of the 2003-04 school year.

The interim August 13th IEP satisfied this requirement.  Under this IEP

the parties clearly contemplated that CH would remain in his prior home

schooling placement, with the District providing push-in services through

September, in order to allow the parents to evaluate various classrooms in

anticipation of a final IEP and classroom placement.  (D1 Exs. 89 at 1, 5; 90.)

While it was perhaps desirable that a final IEP was completed sooner than

October 22nd, the delay apparently occurred due to the parties' attempts to

come to some agreement as to a placement, and was not so egregious as to

deny CH a FAPE.[10]  (D1 Ex. 93.)  In any event, even when finalized, the

2003-04 IEPs were rejected by the parents.  (See Pl. SMF 113, 119, Dkt. No.

65:6.)  As such, any delay in developing them did not prejudice CH's

_____

[10]There is also evidence in the record that the delay may have been necessitated by the
parents inability to attend an October 2nd CSE meeting to address CH's IEP.  (D1 Ex. 98.)

education.  *See Grim v. Rhinebeck Cent. Sch. Dist.,* 346 F.3d 377, 382 (2d

Cir. 2003) (no denial of FAPE from delay in formulating and reviewing proper

IEP where plaintiff would not have resorted to it anyway).  Accordingly, the

court rejects plaintiffs contention that the failure to offer a classroom

placement and final IEP before October 22nd was a "fatal" defect.

### b) Annual Goals

On December 1, 2003, VESID found that the annual goals in the

October 22nd IEP were lacking because they were not sufficiently specific and

measurable.  (D1 Ex. 114 at 6.)  As such, the court next addresses plaintiffs'

brief objections related to these deficient goals and their impact.  (See Dkt.

No. 66 at 21.)

Annual goals are required by 20 U.S.C. § 1414(d)(1)(A)(i)(II).  As such,

in certain circumstances, their insufficiency can constitute the denial of a

FAPE.  In the current instance, however, any deficiency in such goals in the

October 22nd IEP had, at most, only a *de minimis* effect.  First, VESID

required the District to remedy the deficiency in annual goals by January 10,

2004, which was done.   (D1 Exs. 114 at 6; 118; 136.)  As such, this defect in

the IEP, which CH was not being educated under in any event, was quickly

rectified.

28

Additionally, VESID found that the short term objectives and benchmarks in the October 22nd IEP "were sufficiently specific, measurable and provid[ed] the criteria and method of evaluation." (D1 Ex. 114 at 6.) The court must agree, as the IEP contained 41 precise objectives across 5 major subjects and skills. (D1 Ex. 105 at 7-10.) Accordingly, any defect in the annual goals can "be excused because the short-term educational objectives were measurable and sufficiently specific to enable the [CH's] teachers and the parents to understand the CSE's expectations, as well as what [CH] would be doing over the course of the school year." *W.S. v. Rye City Sch. Dist.*, 454 F. Supp. 2d 134, 144 (S.D.N.Y. 2006).

### c) Failure to Develop or Timely Implement an FBA, BIP or Transition Plan

The court next addresses the effect of the District's failure to provide a FBA, BIP or transition plan for the 2003-04 school year, or timely implement such services for the 2004-05 school year.

Turning initially to the 2003-04 school year, plaintiffs contend that CH was unable to transition to school without an FBA, BIP or transition plan, such that the failure to provide these services denied him a FAPE. Setting aside the issue of a transition plan for a moment, the court notes that the plaintiffs have pointed to no evidence indicating that anyone involved in the formulation

29

of the 2003-04 IEP, including the parents or their experts, sought or recommended an FBA or BIP for that year.  (See Pl. SMF ¶¶ 96-120; Dkt. No. 65:6.)  Additionally, while the 2003-04 IEPs did not explicitly provide for an FBA, BIP or transition plan, to the extent such services were desirable, the District provided for their substantial equivalent.

Numerous behavioral and sensory modifications and supports were provided for in the relevant IEPs.  (D1 Ex. 105 at 2-3; P1 Ex. AAA at 3-4.)  Most notably, the District hired Dr. Cosgrove, an expert in PDD and asperger's syndrome, as a behavioral consultant to observe CH at home, and work with the parents towards transitioning CH to school.  It is clear from Dr. Cosgrove's testimony that the scope of her services would have encompassed many of CH's behavioral and social issues, which would otherwise have been addressed by a formal FBA or BIP.  (D1 Exs. 91; 107; Tr1. at 166-74, 181-87.)  However, the parents withdrew their consent to these services because they thought the District was misleading Dr. Cosgrove as to CH's needs and that CH's recommended placement was inappropriate.  (D1 Exs. 94; 116 at 1.)  By doing so, the parents effectively precluded any opportunity to develop a plan for transitioning CH to school, fault for which cannot be laid on the District.

The court must also disagree with SRO Frey's holding that the failure to timely create and implement the FBA, BIP and transition plan provided for in CH's 2004-05 IEPs denied him a FAPE by unduly delaying his access to the IEPs developed for that year.  Delay in implementing an otherwise proper IEP or its component parts denies a child a FAPE only where the child is being educated under the plan, or would be but for the delay.  *See Grim*, 346 F.3d at 381-82.  However, where it is absolutely clear that the child would not be educated under the IEP, even if there was no delay in its formulation or implementation, there can be no denial of a FAPE.  *Id.*

Such is the case here, as the record makes abundantly clear that so long as the relevant IEPs continued to provide a 12 student placement, the parents would not allow CH to be educated under them.  (*See, e.g.*, Tr2. at 395-96, 910, 912, 957, 970.)  Yet, even when the FBA was completed, it and CH's IEPs properly continued to find a 12 student placement appropriate.  (D2 Exs. 37; 43 at 14; Tr2. at 100-101, 111-12, 164-65.)  Thus, true to their word, the parents promptly rejected them.  (D2 Ex. 23; Pl. SMF ¶¶ 151, 152, Dkt. No. 65:6.)

Accordingly, even had the assessments and plans at issue been completed before the school year began, CH would not have been afforded

the benefit of the relevant IEPs.  Therefore, the failure to timely implement an

FBA, BIP and transition plan for the 2004-05 school year, as well as the

failure to explicitly provide for such services during the 2003-04 school year,

had no substantive impact on CH's education and did not deny him a FAPE.

### d) Appropriateness of CH's Placement

Finally, the court addresses the propriety of CH's classroom placement.

In this regard, plaintiffs primarily contend that CH was denied a FAPE

because the District failed to provide him a 6 or 8 child classroom for the

2003-04 and 2005-06 school years.  In support of this argument, they cite to

the Eastern District Case of *A.T. v. New York State Educ. Dept.*, No. 98-CV-

4166, 1998 WL 765371 (E.D.N.Y. Aug. 4, 1998), in which an SRO ordered

that a student suffering from PDD and autism be provided a specifically

constructed 6:1:1 classroom.  Upon the school district's failure to implement

this directive, the Eastern District entered a preliminary injunction enforcing

the SRO's order.  *Id.*  In light of this case, and the various opinions provided to

the District by the plaintiffs' experts indicating that CH should have been

placed in a 6 child classroom, it is contended that the District's failure to do so

for CH denied him a FAPE.

While the zeal exhibited by the SRO and the Eastern District in *A.T.* is

32

admirable, the court does not feel it accurately reflects the mandate of the IDEA.  Even if the court were to concede that a high functioning 6:1:1 classroom was the perfect placement for CH, the IDEA "guarantees ... an 'appropriate education, 'not one that provides everything that might be though desirable by loving parents.'" *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 132 (2d Cir. 1998) (internal citiation omitted).  Districts "are not required to 'furnish[] ... every special service necessary to maximize each handicapped child's potential." *Grim*, 246 F.3d at 379 (quoting *Bd. of Education v. Rowley*, 458 U.S. 176 (1982)).  Rather a school district is required only to provide an education reasonably calculated to promote more than trivial progress in the least restrictive environment. *J.R. v. Bd. of Educ. of City of Rye Sch. Dist.*, 345 F. Supp. 2d 386, 393 (S.D.N.Y. 2004).  In the court's view the District did so here.

For the 2003-04 school year, the District proposed a number of in district and out of district placements, some of which were six child classrooms.  (D1 Exs. 88.)  However, these placements were either full, or were rejected by the parents as being too far away, too large, or functioning at too low a level.  (D1 Exs. 88; 93.)  As such, the final IEPs for 2003-04 recommended CH's placement in a 12:1:3 classroom, which, it should be

noted, had virtually the same student-to-staff ratio as the 6:1:2 plaintiffs repeatedly demanded.  All the children in this classroom had similar needs to CH; requiring a small structured group setting and, with one exception, social skills training.  (D1 Ex. 133.)  They also functioned at CH's academic level.  *Id.* Additionally, CH had shown some progress in his 12:1:1 placement during the 2001-02 school year, despite his poor attendance and utter lack of success in his mainstream placement.  (D1. Exs. 32; 33; 47; 48.)  As such, it was reasonable to believe he would be able to achieve academic success in a 12:1:3, especially given that the final IEPs for the 2003-04 school year provided for numerous program modifications and services to address CH's particular needs.  (D1 Ex. 105 at 2-3; P1 Ex. AAA at 3-4.)  These included: individual OT and speech language therapy; the previously mentioned behavioral consult by Dr. Cosgrove; preferential seating; a sensory diet; extended time to complete tasks; simplified directions, transitions, activities and assignments; refocusing and redirection; and various other supports.  *Id.*

Finally, after a thorough review, all the administrative hearing officials found that a 6 student placement was improper for CH, as such placements are generally reserved for students with multiple disabilities or highly intensive management needs.  *See* 8 N.Y.C.R.R. 200.6(h)(4)(ii)(a).  In the absence of

34

clear evidence to the contrary, the court declines to contradict this finding.
*See Walczak*, 142 F.3d 119, 129 (2d Cir. 1998) (deference to administrative
decisions on questions of educational policy is particularly appropriate where
review has been thorough).  The same applies to plaintiffs' *post hoc* argument
that CH should have been placed in an eight child placement, as the court is
not convinced by the record that CH's needs were sufficiently intensive to
justify such a placement under 8 N.Y.C.R.R. 200.6(h)(4)(ii)(b).

In light of the above, the court must agree with the IHO and SRO below
that the 12:1:3 placement and attendant services were reasonably calculated
to provide CH with more than trivial educational advancement for the 2003-04
school year.  Accordingly, such a placement was more appropriate for CH
than the smaller placements the parents sought, as it complied with the
IDEA's requirement that children be educated in the least restrictive
environment that they can make meaningful progress in.  *See* 20 U.S.C. §
1412(a)(5)(A).  *See also* 8 N.Y.C.R.R. 200.13(a)(5) (directing that children
with autism or asperger's syndrome should be mainstreamed where
appropriate).

For much the same reasons, the court finds that the recommended
12:1:2 placement for the 2004-05 school year was entirely appropriate.  On

this issue, the court can add little to the excellent discussion by SRO Frey. *See Application of a Child with a Disability*, Appeal No. 05-128 at 16-18. However, a few facts bear repeating. First, while the 2004-05 placement had one less staff member than the 2003-04 placement, the relevant IEPs provided CH with a one-on-one aide. (D2 Exs. 10; 37.) Further, the 12:1:2 placement actually consisted of only 10 children. (Tr2. at 29.) While a number of the parents' experts again indicated that a 6:1:1 placement would be best for CH, the independent behavioral consultants who developed the FBA for CH indicated that the larger placement was appropriate. (Tr2 at 100-01, 111-12, 164-65.) Finally, extensive services and program modifications were again authorized to ensure CH's educational success. (D2 Exs. 10; 37.) As such, and for the reasons articulated by SRO Frey, the court finds that 2004-05 placement and attendant services were reasonably calculated to enable CH to receive educational benefits in the least restrictive environment.

**B.   ADA, REHABILITATION ACT AND § 1983 CLAIMS**

Having addressed plaintiffs' arguments under the IDEA, the court next turns its attention to plaintiffs' claims under Section 504 of the Rehabilitation Act and the ADA, as well as their § 1983 claim for the violation of these statutes.

Initially, the court notes that individuals cannot be held liable for violations of the ADA or Rehabilitation Act in their personal or official capacities. *See, e.g., Menes v. CUNY*, 92 F. Supp. 2d 294, 306 (S.D.N.Y. 2000) (citations omitted).  Accordingly, such claims must be dismissed against defendants Boiko, Casey, Huff, Riebel, McClure and Smith.

Addressing these claims more generally, the ADA and Rehabilitation Act both require more than a mere violation of the IDEA to establish entitlement to relief.  *Wenger v. Canastota Cent. Sch. Dist.*, No. 5:95-CV-1081FJSGJD, 2004 WL 726007, at *6 (N.D.N.Y. Apr. 5, 2004).   At a minimum, bad faith or gross misjudgment as to CH's educational rights must be established to allow an inference of discrimination.  *See, e.g., Butler*, 106 F. Supp. 2d at 420 (Section 504); *R.B. v. Bd. Of Educ. Of the City of N.Y.*, 99 F. Supp. 2d 411, 419 (S.D.N.Y. 2000) (ADA).  However, in light of the above discussion, neither state of culpability is present here, and the ADA and Rehabilitation Act claims must be dismissed in their entirety.  *See Wenger*, 2004 WL 726007, at *6-7.

Correspondingly, plaintiffs' § 1983 claim must be dismissed, as it is premised on the alleged violations of the ADA and Rehabilitation Act. Further, plaintiffs have failed to establish personal involvement in the alleged

37

statutory violations by the individual defendants, or a discriminatory custom or policy by the municipal defendants.  *See, e.g., Hawkins v. County of Oneida, N.Y.*, 497 F. Supp. 2d 362, 376-78 (N.D.N.Y. 2007) (recognizing that personal liability under § 1983 exists only if the defendant was personally involved in the discriminatory conduct); *J.F. v. Sch. Dist. of Philadelphia*, No. CIV. A. 98-1793, 2000 WL 361866, at *8 (E.D. Pa. Apr. 7, 2000) ("§ 1983 liability attaches to a municipality only when a municipal official, acting with the necessary policy-making authority and with deliberate indifference to the rights of individuals establishes or knows of and acquiesces in a policy, practice or custom which deprives individuals of constitutional or statutory rights.") (citations omitted).  These inadequacies provide an alternative basis for the dismissal of plaintiffs' § 1983 claims.

## IV.  <u>Conclusion</u>

In summary, the court finds: 1) that plaintiffs' challenges to the 2001-02 and 2002-03 school years are barred because an administrative due process hearing was not timely requested, 2) CH was not denied a FAPE for the 2003-04 or 2004-05 school years, and 3) plaintiffs have failed to establish a triable issue as to their Rehabilitation Act, ADA and § 1983 claims.

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment is

**GRANTED** and plaintiffs' claims are dismissed in their entirety; and it is

further

**ORDERED** that plaintiffs' motion for summary judgment is **DENIED**;

and it is further

**ORDERED** that the decision of State Review Officer Frey is

**REVERSED** to the extent it found defendants' delay in creating and

implementing an FBA, BIP and transition plan denied CH a FAPE for the

2004-05 school year; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment in favor of

defendants and against plaintiffs; and it is further

**ORDERED** that the Clerk of the Court provide a copy of this Order

to the parties.

**IT IS SO ORDERED.**

August 20, 2008
Albany, New York

Gary L. Sharpe
U.S. District Judge

39